UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **RANDALL TURNER,** | Civil Case No. 3:12-cv-01851-KI |
| Plaintiff, | OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| **MULTNOMAH COUNTY, a political subdivision of the State of Oregon; WASCO COUNTY, a political subdivision of the State of Oregon; GILLIAM COUNTY, a political subdivision of the State of Oregon; HOOD RIVER COUNTY, a political subdivision of the State of Oregon; SHERMAN COUNTY, a political subdivision of the State of Oregon; and OLE LLOYD ANDERSON ERSSON, M.D.; MONICA WAHLS, N.P.; NORTHERN OREGON CORRECTIONAL FACILITY,** | |
| Defendants. | |

Page 1 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Randall Turner
90675-011
FCI Terminal Island
P.O. Box 3007
Terminal Island, CA 90731

     *Pro se* Plaintiff

James Dumas
Michael J. Estok
Lindsay Hart, LLP
1300 SW Fifth Ave., Ste. 3400
Portland, OR 97201

     Attorneys for Defendant Monica Wahls, N.P.

Jenny M. Madkour, County Attorney
for Multnomah County
David N. Blankfeld
Assistant County Attorney
Office of Multnomah County Attorney
501 N.E. Hawthorne Blvd., Ste. 500
Portland, OR 97214

     Attorneys for Defendants Multnomah County and Ole Ersson, M.D.


KING, Judge:

     *Pro se* plaintiff Randall Turner, a federal inmate housed at Inverness Correctional Facility in Multnomah County and at Northern Oregon Correctional Facility ("NORCOR") during the events alleged in his complaint, brings claims against Multnomah County, Dr. Ole Lloyd Anderson Ersson, and Nurse Practitioner Monica Wahls arising out of his medical treatment while housed at the two correctional institutions.[1]  Pending before me are the defendants' Motions to Strike Turner's expert report [118, 121] and their Motions for Summary Judgment

---

[1]I previously dismissed NORCOR and the defendant counties listed in the caption.

Page 2 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

[131, 135 ].  For the following reasons, I deny the motions to strike and grant the motions for summary judgment.

## BACKGROUND

I.    Allegations and Procedural History

Turner was initially represented by counsel.  His Second Amended Complaint, drafted by counsel, alleges a claim of negligence against Multnomah County, Dr. Ersson, and Nurse Wahls.

Turner specifically alleges:

Defendants were negligent in one or more of the following particulars:

a.  In failing to diagnose and treat the neurological progressive and severe disease[] he was suffering from, spinal stenosis;

b.  In failing to obtain a qualified medical evaluation of Turner;

c.  In failing to refer him for a neurological/neurosurgical consultation; and

d.  In failing to provide him with medical care and treatment associated with the minimal standards of a competent medical professional.

Second Am. Compl. ¶ 19.  He also alleges medical malpractice, involving similar assertions as those contained in his negligence claim, and a § 1983 claim of deliberate indifference to medical needs against Dr. Ersson and Nurse Wahls.  He alleges permanent spinal cord damage, respiratory failure, kidney damage, brain damage, and vascular damage as a result of the delay and poor medical care.

Turner's counsel subsequently requested leave to withdraw which I granted.  After attempting to appoint pro bono counsel for many months, I directed Turner to proceed *pro se*.  I moved the case schedule deadlines on a number of occasions, sometimes over the objections of the defendants.  The latest expert report deadline was November 12, 2014.

Page 3 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

II.    Facts

Except as specifically noted, the following facts are undisputed or are indisputable:

Turner was arrested on federal charges and detained at Multnomah County's Inverness Correctional Facility, as well as at NORCOR, during the times relevant to his complaint. He was arrested, arraigned, and detained on August 25, 2009. He entered a guilty plea on July 12, 2010. The Court delayed his sentencing due to several medical events, described more fully below, which occurred after his guilty plea.

Turner was treated at Inverness on July 26, 2010 for chronic back pain, at which time he reported increased pain, an inability to bend his neck, and numbness in his hands. Upon examination, Turner demonstrated tenderness in his lower cervical and upper thoracic spine, with a decreased but not seriously diminished range of motion.[2] Turner reported he had already had one surgery on his back, and he had been told he would need another surgery at some point. He was prescribed Flexeril and acetaminophen.

Turner was transferred to NORCOR soon thereafter.

While at NORCOR, Nurse Wahls examined and treated Turner four times (in bold type below) out of a total of eight medical visits. Pl.'s Ex. B. I have summarized the substance of those appointments below.

Turner first wrote a medical request complaining of a rash on his arm on August 3.

•    **August 4, 2010**: Nurse Wahls observed the mild rash and ordered two creams to treat it. She also reported Turner's history of cervical fusion and herniated disc;

_____

[2]The chart note is unsigned. Pl.'s Ex. A, at 31 (021). Defendant Dr. Ersson does not address the chart note in his declaration. Dr. Ersson's expert witness, Reed Wilson, M.D., attributes the note to Dr. Ersson. Wilson Decl. Ex. 2, at 2. See footnote 3 below for an explanation of how I cite Turner's Exhibit A.

Page 4 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

she noted a cervical muscle spasm and directed him to engage in range of motion exercises daily; she discontinued acetaminophen and gave Turner ibuprofen.

- August 12, 2010:  Turner requested a change in medication for pain; ibuprofen was discontinued in favor of gabapentin (Neurontin) and Mobic (an NSAID).

- August 13, 2010:  a note reflects Turner's complaints of chronic back pain, but that he was in no distress; the nurse described him as "calm/cooperative."  Pl.'s Ex. B, at 2.

Turner wrote a medical request to treat a sore throat on August 14.

- **August 18, 2010**:  Nurse Wahls treated Turner's sore throat by recommending he stay hydrated; she denied his request for a salt gargle due to his history of hypertension.  Turner also reported his "neck is feeling better.  The neurontin helps."  Id.  Nurse Wahls continued the Neurontin, as well as acetaminophen and Mobic for pain.

Turner requested more cream for the rash on his arm, medical care for his constipation, and complained about back pain in an August 30 written request.

- August 31, 2010:  Turner's rash was treated with hydrocortisone cream and his constipation with fiber.

Turner wrote a medical request complaining the fiber was not working on September 2.

- September 3, 2010:  Turner was informed he needed to take the fiber for longer in order for it to work effectively.

Turner completed a medical request indicating he had something in his eye and, separately, that he was still constipated.

- **September 8, 2010:**  Nurse Wahls examined Turner in relation to his complaints of constipation and eye problems.  She prescribed eye drops, Metamucil and milk of magnesia.  Although not contained in the treatment note, Turner asserts he complained about lack of equilibrium and balance; Nurse Wahls allegedly directed him to submit a written medical request and refused to discuss this new complaint with Turner.

That same day, Turner wrote a medical request indicating increased back pain and new

Page 5 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

leg weakness which "began less than a week ago and are becoming more severe." Pl.'s Ex. B, at

6(a). According to Turner, he completed the medical request form prior to his visit with Nurse

Wahls; it is dated September 8 at 6:30 AM. The medical request is stamped received by the

medical department on September 9.

On September 12, Turner reiterated his complaints of back pain and leg weakness in a

written medical request.

- **September 16, 2010**: Turner informed Nurse Wahls that he believed he had a
ruptured disc and needed an MRI; he wanted to be sent to the hospital. He
described shooting back pain up and down his back, as well as between his
shoulder blades, weakness in his left leg. Nurse Wahls observed Turner walking
and noted his inconsistent use of both legs. He was able to fully bear weight on
both sides. She noted no evidence of foot drop. She noted bilateral leg strength
and resistance was within normal limits. She found no evidence of paraspinous
muscle spasm bilaterally. She assessed malingering and suggested acetaminophen
for pain.

At Turner's defense counsel's request, made on September 21, 2010, an order to transfer

Turner was entered to facilitate medical care from a physician. Turner arrived at Inverness on

September 23 and completed a Medical Request Form that day identifying loss of strength in his

right leg, and numbness in his abdomen, chest, and down both legs. Defendant Dr. Ersson

immediately reviewed Turner's medical records from NORCOR and recorded the following in

Turner's chart:

> CR–Federal attorney letter re: client requesting [transfer at] NORCOR
> [complains of] numbness in his leg and abdomen interfering [with] his ability to
> walk. Client requesting an MRI. Seen by unnamed provider 9/16 [complained of]
> ruptured disc and needing MRI. Complains of shooting back pain up and down
> my whole back between my shoulder blade and weakness in L leg, but observed
> walking inconsistent use of both legs. Exam reassuring[;] client felt to be
> malingering. Rx'd tylenol. Similar meds continued her[e], Ibu instead of
> meloxicam [Mobic]. Currently has CR 9/30.

Ersson Decl., Ex. 1, at 1.

Dr. Ersson requested that Turner be observed for "any difficulty walking or other behavioral characteristics."  Id.

The next day, September 24, Matthew Rose, D.O., examined Turner and noted Turner's reports of numbness, dragging right leg, and weakness.  Dr. Rose felt any neurological complaint was not consistent with physiology and that Turner was malingering.  Nevertheless, he referred Turner for a neurological consultation.

Turner continued to complete Medical Request Forms, one on September 25 and one on September 27.  He requested a wheelchair to accommodate his difficulty walking and asked whether an appointment had been made with a neurologist.

Turner signed an outside referral consent form on September 28.  On September 29, Turner was informed that the U.S. Marshals Service had approved the appointment, that Turner's "information" had been faxed to the neurologist, and that once the neurologist had reviewed Turner's file an appointment would be set.  Ersson Decl. Ex. 4, at 1.

Turner requested a wheelchair again on October 2, which the institution provided him on October 4.  He had been using a walker.

A nurse called OHSU on October 4 and learned it could take five to ten business days for a review to be completed; OHSU would call back to schedule the appointment.

In his Medical Request Form on October 10, Turner reported losing motor control in his right leg and a spreading numbness and cold fire feeling.  An Inverness nurse called OHSU twice on October 11 and faxed information to a Dr. Marks for review.  Turner requested information on October 13, again asking whether an appointment had been scheduled and seeking emergency

Page 7 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

room care for his worsening condition. The same nurse called OHSU on October 14 and left a

message "asking for a written reason for the scheduling delay to pass on to the client." Pl.'s Ex.

A, at 28 (046).[3]  Turner reported to a different nurse that day that he felt his legs were growing

weaker, that he had a "cold and firey feeling" in his body, and felt spasms in his diaphragm. Id.

at 27 (044). He underscored he was not looking for drugs but he wanted to go to the emergency

room since no neurology appointment had been scheduled.

Dr. Rose attempted to examine Turner the very next day, on October 15, but Turner was

"too agitated and combative to examine." Ersson Decl. Ex. 6, at 1. A nurse called OHSU

scheduling and left another message that day. The same nurse called OSHU again on October 18

and learned that an appointment had been scheduled for Turner on November 16. OHSU

informed the nurse it was the first available appointment and that "all of their appts are at least

one month out." Ersson Decl. Ex. 7, at 1.

From that date until his neurology appointment, Turner wrote one request for medical

attention for swelling in his right foot. Inverness providers examined him on three occasions:

once for a medication change (11/2/2010); once for pain in his feet (11/9/2010); and once for a

variety of complaints including poor sleep, foot pain, and progression of his back pain,

numbness, and equilibrium problems (11/10/2010). The latter appointment was with Dr. Ersson,

who noted redness and swelling around Turner's toes and thought it was MRSA.[4]  The doctor did

---

[3]Turner failed to number the pages in his Exhibit A, and some of the typed numbers in the
bottom right-hand corner appear more than once. I have numbered Exhibit A as pages 1 through
31 and indicate in parentheses the number appearing in the bottom right-hand corner.

[4]Methicillin-resistant Staphylococcus aureus, a staph infection resistant to common
antibiotics. www.mayoclinic.org/diseases-conditions/mrsa/basics/definition/con-20024479 (last
visited May 18, 2015).

not examine Turner's neurologic status, but noted an evaluation had been scheduled.  Dr. Ersson

prescribed Bactrim and doxepin.

OHSU neurologist Daniel M. Gibbs, M.D., examined Turner on November 16, 2010.  Dr.

Gibbs noted no spine tenderness, a normal range of motion, and absent Spurling's and

Lhermitte's signs.  Turner demonstrated normal strength and tone in his arms, but was unable to

flex his right hip against gravity.  Dr. Gibbs suspected poor effort.  Turner demonstrated give-

way weakness at the right ankle dorsiflexion.  He walked with a staggering gait.  Turner

indicated "decreased pin and temperature on abdomen and back distal to T10, but inconsistent

and changing responses to pin and temperature in his legs, feels pin most of the time, claims to

not feel vibration at all in legs."  Ersson Decl. Ex. 8, at 5.  Dr. Gibbs opined:

> The exam is very inconsistent and is suggestive of malingering or another
> psychogenic cause for his symptoms.  However a spinal cord lesion needs to be
> ruled out.  This could conceivably be transverse myelitis or even a spinal tumor
> with the picture confused by embellishment of symptoms.  The normal reflexes in
> the legs and absence of Babinski signs argues against a significant myelopathy.
> There is no evidence of Guillain-Barre syndrome.

Id.  Dr. Gibbbs recommended an MRI of the thoracic spine.

The next day, Dr. Ersson noted Dr. Gibbs' conclusions in Turner's chart and instructed

his assistant to seek U.S. Marshals Service approval for the MRI, which it granted.  Ersson Decl.

Ex. 9, at 1.  By November 18, Turner was scheduled for an MRI at OHSU to take place on

December 2.

Dr. Ersson examined Turner on November 22, who noted Turner walked with a

staggering, wide gait, demonstrated decreased strength in his right leg, continued to use a

wheelchair, and insisted he did not want drugs.  Dr. Ersson noted the "unusual constellation of

Page 9 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

neuro symptoms" and that Turner had an MRI scheduled.  Ersson Decl. Ex. 11, at 1.

Dr. Ersson reviewed the results of the MRI on December 3, the day after the procedure. He opined "MRI results show severe spinal stenosis–needs neurosurgery consult and possible surgery to correct spinosis."  Id. at 2.  He directed his assistant to contact the U.S. Marshals Service to obtain approval for a neurosurgery referral.  Turner sought a medication change to better address his back and neck pain on December 7.  Dr. Ersson's December 8 chart note reflects that the U.S. Marshals Service approved the neurosurgery referral, and that he increased Turner's gabapentin, doxepin, and ibuprofen.

On December 10 and 11, Turner wrote a request for a consultation with a doctor about his medication to better manage his pain.

On December 13, Dr. Ersson saw Turner and made some medication changes and planned to discuss the case with Dr. Gibbs.  He then paged Dr. Gibbs, but got no response.  Dr. Ersson planned to email Dr. Gibbs.

On December 15, the institution learned Turner's neurosurgery consultation was scheduled with OHSU's Andrew Nemecek, M.D., on December 23.  In the meantime, Turner complained of increased swelling in his right foot and calf, as well as pain.  Via Medical Request Forms, he requested methadone on December 16 and reiterated his pain complaints on December 19.[5]

Turner provides only one page of Dr. Nemecek's six page report from the December 23 neurosurgery consultation.  Dr. Nemecek assessed "[s]evere central spinal canal stenosis and

_____

[5]Neither party submitted any medical chart notes between December 17 and December 25.

cord compression at C7-T1 secondary to degenerative disk disease and ligamentum flavum

laxity.  Abnormal cord signal at this level likely represents compressive myelopathy."  Pl.'s Ex.

A, at 19 (RT 000225).  He recommended an MRI of the cervical spine, a CT of the cervical and

thoracic spine, and plan for a C7-T1 laminectomy, posterior fusion C5-T2.

Two days later, on December 25, Turner went to the hospital for increased symptoms of

COPD (Pl.'s Ex. A, at 18 (RT 000608)) and was diagnosed with hypoxia (most likely due to

pulmonary edema versus pulmonary embolus) and renal failure, for which a Foley catheter was

indicated.  Pl.'s Ex. F, at 1.  The hospital discharged Turner the following day.

The day of his discharge from the hospital, Turner submitted a Medical Request Form

complaining of difficulty breathing, kidney failure, and bladder problems.  An Inverness nurse

checked on him and Turner requested his methadone.  He was pleasant, calm and reported "doing

OK."  Pl.'s Ex. A, at 17 (052).

He returned to the jail's clinic on the morning of December 27.  He requested pulling his

Foley catheter out.  At about 11:00 that night, a deputy reported Turner was losing

consciousness.  The nurse observed Turner falling asleep mid-sentence.  The nurse directed him

to keep his oxygen on at 2L via nasal cannula, keep his feet up on the bunk, keep his Foley

catheter below his bladder, and use the wheelchair.  The on-call doctor directed the nurse to hold

Turner's methadone, and to use Narcan if needed (to reverse an opioid overdose).

On December 28, at 9:30 in the morning, the nurse noted Turner's color was normal, he

was speaking in complete sentences, he kept holding his breath, and was talking the whole time

about how ill he felt.  At 4:15 p.m., a nurse noted Turner had stopped using his oxygen in his

room and was holding his Foley catheter bag up by his chest; she instructed him to use the

Page 11 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

oxygen and keep the Foley catheter below his bladder.  Later that night, another nurse expressed concerns about over-sedation and swelling in Turner's feet and ankles.  Labs were ordered for the next day to check Turner's renal issues.  Turner denied feeling over-sedated.  At 11:00 that night, he was "really angry" with the doctor and demanded an increase in his pain medications; he refused to use his oxygen.

At 4:45 the next morning, Turner reported not sleeping well and not using his oxygen. An hour later, a deputy called a nurse to Turner's cell when Turner felt lightheaded, dehydrated, anxious, paranoid, and "feeling of death."  Id. at 12 (040).  The nurse instructed him to rest, with his head and feet elevated and she planned to continue monitoring him.

Turner pulled out his catheter that day–December 29–to force his admittance to the hospital again.  Hospital doctors diagnosed Turner with pneumonia and started him on antibiotics.  Turner returned to the jail on December 30.

He again sought medical attention for wheezing and coughing on December 31. Inverness nurses checked on him three times on December 31, three times on January 2, once on January 3, and twice on January 4.  He continued to experience some breathing problems, and his feet and legs were swollen and changing color.  He reported feeling short of breath.  On January 6, nurses checked on him twice, and Dr. Ersson examined him.  Turner had vomited and was asking to go to the hospital.  Dr. Ersson noted Turner's cellulitis was not improving adequately and Turner agreed to start antibiotics.  The doctor emphasized the need for Turner to elevate his feet, but thought Turner's pneumonia was resolving as was the renal failure.  Dr. Ersson's notes reflect:  "Reportedly [marshals] have approved MRI, not yet surgery."  Id. at 5 (021).

On January 7, Turner's vomiting was treated with an anti-nausea medication, and on

Page 12 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

January 8 he was noncompliant with his oxygen order and was demanding to go to the hospital. Turner had trouble speaking in complete sentences at 6:30 that night, he appeared to tire easily, his legs were purplish and taut with pitting edema, and he reported feeling a little short of breath. Half an hour later, he was sent to the hospital for shortness of breath, pitting edema, and pneumonia.

Per hospital records, Turner "presented to the Adventist Hospital in acute respiratory failure secondary to multilobar pneumonia and bilateral pulmonary emboli. He was transferred to the intensive care unit and required at one point 100% FiO2 and concerns were raised that the patient would not survive his hospitalization." Pl.'s Ex. F, at 4. Hospital physicians successfully extubated Turner on January 19 and transferred him to the medical ward on January 21. He took Coumadin for his pulmonary emboli and antibiobiotics for his pneumonia. These complications delayed his surgical intervention to treat his cervical spinal myelopathy. Turner took 20 to 40 mg a day of methadone to manage his pain.

Turner finally underwent a spinal fusion and laminectomy at OHSU in August 2011.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the

non-moving party and draw all reasonable inferences in favor of that party." Nicholson v.

Hyannis Air Service, Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (citation omitted).

## DISCUSSION

I.      Motions to Strike Dr. Ochoa's Reports

      A.      Proposed Contingency Fee Payment to Dr. Ochoa

All of the defendants move to preclude Turner from relying on anything produced by his

expert, arguing the expert's payment arrangement with Turner makes his opinions unreliable.

Although he provided services to Turner for three years on a pro bono basis, Turner's expert,

Jose Ochoa, M.D., Ph.D., submitted a Compensation Statement on October 8, 2014 in which he

indicated he would "accept 10% of the award, if any" should Turner recover damages.  Estok

Decl. in Supp. of Mot. to Strike Ex. 2, at 1.  Dr. Ochoa reported, "Mr. Turner is happy and even

grateful for that covenant."  Id.  After defendants moved to strike his report on the basis that an

expert's contingency fee agreement violates ethical and procedural rules, and specifically the

rules of the American Academy of Neurology of which he is a member, Dr. Ochoa rescinded his

statement and reiterated his original willingness to testify on a pro bono basis.  See id. Ex. 3

(American Academy of Neurology, Qualifications and Guidelines for the Physician Expert

Witness (approved June 25, 2005)); Ex. 4 (American Academy of Neurology, Code of

Professional Conduct ¶ 6.4 (Dec. 2009)).

Defendants urge me to strike the report, regardless of Dr. Ochoa's rescission of the

compensation statement, pursuant to the authority in Federal Rule of Evidence 702.  They argue

Dr. Ochoa's disavowal of the contingency fee arrangement cannot cleanse his expert report of the

bias such an agreement creates.

A plethora of authority supports defendants' position that striking the report is an acceptable response to punish the impropriety of entering into a contingency fee arrangement with an expert witness.  Ouimet v. USAA Cas. Ins. Co., No. EDCV 00-00752-VAP, 2004 WL 5865274 (C.D. Cal. July 14, 2004) (agreement violated California Rules of Professional Conduct which prohibit an attorney from testifying and receiving payment contingent on the outcome of the case; expert precluded from testifying); Farmer v. Ramsay, 159 F. Supp. 2d 873, 883 (D. Md. 2001) ("improper to pay an expert witness a contingent fee" under Maryland law; report stricken), aff'd on other grounds, 43 F. App'x 547 (4th Cir. 2002); Cosgrove v. Sears Roebuck & Co., No. 81 Civ. 3482, 1987 WL 33595 (S.D.N.Y. Dec. 21, 1987) (proceedings tainted by contingency fee agreement; expert precluded from testifying; given 60 days to obtain new expert); In re SMTC Mfg., 421 B.R. 251, 264 n.2 (W.D. Tex. Bankr. 2009) (witness was limited to testifying as a summary witness regarding certain exhibits she prepared for trial since accountants may not be retained via contingency arrangement under Texas rules); Accrued Fin. Servs., Inc. v. Prime Retail, Inc., 298 F.3d 291, 300 (4th Cir. 2002) (expert testifying pursuant to contingent fee violates public policy); City and Cnty. of Denver, Colo. v. Bd. of Assessment Appeals of the State of Colo., 947 P.2d 1373, 1379 (Colo. 1997) ("settled principle of American law [that] expert witnesses should not receive contingent fees"); Straughter v. Raymond, No. CV 08-2170-CAS, 2011 WL 1789987, at *3 (C.D. Cal. May 9, 2011) (expert's opinions "were rendered when she had a direct financial interest in the outcome of this action" even though she subsequently revoked her contingency fee arrangement; testimony excluded).

Nevertheless, I conclude striking Dr. Ochoa's October 2014 report in these circumstances is unnecessary.  Defendants cite no Ninth Circuit law requiring me to strike expert testimony

given pursuant to a contingency fee agreement.  See Straughter, 2011 WL 1789987, at *2 n.3

(court did not find Ninth Circuit authority requiring exclusion).  Instead, I am directed to

"determine reliability in light of the particular facts and circumstances of the particular case."

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 158 (1999).

Dr. Ochoa's long history of providing medical opinions for Turner on a pro bono basis

before he prepared his October 2014 report–medical opinions which are consistent with his

expert report–suggests any contingency fee arrangement did not affect his opinions.  See United

States v. Turner, 3:09-cr-00323-KI (sentencing transcript at ECF No. 68).[6]  As a result, if Dr.

Ochoa had any incentive to lie or exaggerate based on the new contingency agreement–which is

the focus of the cases above–his October 2014 report does not reflect such bias.[7]  Finally, where

Turner's negligence claim depends upon expert witness opinion just to give him an opportunity

to test defendants' arguments, I find it would be inequitable and prejudicial to Turner to strike his

expert's report.  I deny defendants' Motions to Strike Dr. Ochoa's October 6, 2014 expert report.

B.    Dr. Ochoa's Additional, Late Reports

Turner also offers two other reports from Dr. Ochoa dated February 16, 2015 (in the form

of a declaration in support of his opposition) and February 24, 2015.  Defendants request that I

not consider these reports in resolving the summary judgment motions as Turner produced them

---

[6] I consider Dr. Ochoa's earlier testimony not for the truth of the matter therein, but only to evaluate the consistency of his opinions over time.

[7] In any event, given Turner's pro se status and his obvious ignorance regarding the rules applicable to payment of experts, I would give Turner 60 days to find a new expert if I deemed it appropriate or necessary to strike Dr. Ochoa's expert report.  Were I to resolve the conflict this way I would only further delay resolution of this already very old litigation and, as a result, I decline to strike the October report.

after expiration of the deadline for expert disclosures.

The deadline for all expert reports was November 12, 2014.  By federal rule, Dr. Ochoa's written report was required to contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]"  Fed. R. Civ. P. 26(a)(2)(B).  While reports may be supplemented, "this does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report. . . .To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports."  Plumley v. Mockett, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010).  A supplemental expert report containing additional opinions or stronger opinions is beyond the scope of proper supplementation and may be excluded under Rule 37(c).  Id.

Turner produced the February reports more than three months after the deadline had passed, without requesting an extension and without permission to produce rebuttal reports. Since Turner provided the improper supplemental reports, it is his burden to demonstrate his failure to comply with the rules was substantially justified or harmless.  Torres v. City of L.A., 548 F.3d 1197, 1213 (9th Cir. 2008).

Turner does not attempt to demonstrate Dr. Ochoa's provision of supplemental reports was substantially justified in any way.  Throughout the late reports, Dr. Ochoa references additional materials he suggests he did not have before, such as Dr. Gibbs' deposition and some medical records.  However, there is no indication defendants withheld either of those items from Dr. Ochoa.  In short, Turner offers no explanation for the supplemental reports, other than to indicate they are a response to the opinions of the defense experts and further support for Dr. Ochoa's original report.

Page 17 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

In considering harmlessness, I conclude that because Dr. Ochoa's February reports implicitly and explicitly respond to the arguments defendants made in their summary judgment motions, and the opinions of their defense experts, Dr. Ochoa's February reports prejudice defendants' ability to defend this action. While I could give the defendants an opportunity to produce rebuttal reports of their own, which would eliminate prejudice to them, I conclude the additional delay and expense in this case, which is already three years old, would only further prejudice defendants. Wong v. Regents of Univ. of Cal., 410 F.3d 1052, 1062 (9th Cir. 2005) ("[d]isruption to the scheduling of the court and other parties is not harmless"); Hoffman v. Const. Protective Servs., 541 F.3d 1175, 1180 (9th Cir. 2008) (failure to comply with Rule 26 was not harmless where court was required to create new briefing schedule).

In sum, I do not strike Dr. Ochoa's October 2014 report, but I do strike his February 2015 reports.

II.    Whether to Strike Turner's Filings and Evidence

In their replies, defendants seek to strike Turner's opposition as untimely. They also make several evidentiary objections to the materials he submitted.

A.    Turner's Filings

With respect to defendants' argument that Turner's opposition to summary judgment should be stricken because it was not filed by the February 23, 2015 due date, I note that since Turner is a pro se prisoner his materials are deemed filed on the date he placed the materials in the prison's institutional mailbox.[8] Houston v. Lack, 487 U.S. 266, 275-76 (1988) (pro se

---

[8]Turner represents he submitted his Addendum to his Response in the institutional mailbox on February 26, which is after the deadline. I do not consider Turner's late-filed Addendum. In any event, the short Addendum contains argument and evidence available

prisoner filing is dated from time prisoner delivers it to prison authorities); see also Washington

v. Duncan, 357 F. App'x  843 (9th Cir. 2009) (unpublished) (vacating district court's order

granting summary judgment based on prisoner's failure to timely file an opposition; citing

mailbox rule).  In any event, if Turner's filings were late, defendants suffered no prejudice from

the delay as I freely granted them extra time to respond.

Additionally, in response to each defendants' reply, in which each defendant sought to

strike Turner's briefing and some of the evidence he submitted, Turner filed what he labeled his

"Second Response in Answer."  I allowed the filing and gave the defendants an opportunity to

file sur-replies.  In their sur-replies, defendants object to the new briefing as untimely and

impermissible.

Given the nature of defendants' evidentiary objections in their own replies, Turner was

permitted by Local Rule 56-1(b) to respond to those evidentiary objections.  Further, any

prejudice to defendants caused by the additional briefing and evidence has been eliminated by the

opportunity to file sur-replies.

 Accordingly, I deny defendants' requests to strike Turner's briefing.

B.    Turner's Evidence

1.    Turner's Exhibits C and H

Defendants move to strike the affidavit and letters of Thomas E. Price, Turner's federal

public defender during the time at issue in this case, as containing inadmissible hearsay and

improper opinion testimony by a lay person.  I will take the evidentiary objections into account in

my review of the evidence, but I do not strike the entirety of the exhibits as they contain some

---

elsewhere on the docket.

admissible evidence.

### 2. Turner's Exhibit E

Defendants also seek to strike the excerpts from a medical textbook as inadmissible hearsay, and without foundation. Since none of the experts rely on Harrison's Principles of Internal Medicine, I may not consider the excerpts pursuant to the federal rules of evidence. See Fed. R. Evid. 803(18) (medical articles admissible as substantive evidence if from a reliable medical authority and relied on by a medical expert witness). In addition, Turner does not attempt to authenticate the excerpts as required by Federal Rules of Evidence 901 and 902. I do not consider Exhibit E.

### 3. Turner's Exhibit G

Turner submitted an excerpt of his independent medical examination performed by Dr. Ochoa. Defendants contend it is inadmissible hearsay. Since Dr. Ochoa would present his IME findings were he to testify at trial, I do not accept defendants' argument. Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). In addition, I do not require Turner to strictly comply with the summary judgment rules. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) ("[p]ro se inmates are, however, expressly exempted from" the rule that pro se litigants "must comply strictly" with summary judgment rules).

## III. Motions for Summary Judgment

As an initial matter, I first address Turner's mistaken belief that there is a difference between his "negligence" claims and his separately identified "medical malpractice" claims. He argues, for example, that Nurse Wahls failed to address the medical malpractice claim alleged

against her, even though she argues at length that she is entitled to judgment on Turner's negligence claim.

Medical malpractice is simply a form of negligence.  Zehr v. Haugen, 318 Or. 647, 654, 871 P.2d 1006 (1994) (plaintiff's complaint states facts "sufficient to constitute a claim for negligence in the form of medical malpractice"); see also Ritter v. Sivils, 206 Or. 410, 413, 293 P.2d 211 (1956) ("Malpractice actions are based upon negligence and . . . they do not differ in their essential elements from any other kind of action in which recovery is sought on charges that the alleged tort feasor failed to exercise due care.").  My analysis of the motions reflects this law.

In addition, Turner makes several allegations in his briefing about other medical providers, such as Dr. Rose, Dr. Gibbs, and Nurse Ford, but none of those individuals are named as defendants in this case.  To the extent individuals working for Multnomah County inform a decision about the negligence of the County overall, I consider their actions below.

A.    Nurse Wahls

Nurse Wahls contends I must grant her summary judgment motion and dismiss the claims against her because there is no material issue of fact that she met the standard of care and did not engage in any conduct that qualifies as deliberate indifference under the Eighth Amendment to the U.S. Constitution.

1.    Medical Malpractice

Turner must plead and prove the following elements in his medical malpractice claim against Nurse Wahls:  (1) a duty ran from Nurse Wahls to Turner; (2) Nurse Wahls breached that duty; (3) Turner was harmed in a way that is measurable in damages; and (4) a causal link exists between the breach and the harm.  Moser v. Mark, 223 Or. App. 52, 55-56, 195 P.3d 424 (2008)

Page 21 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

(citing Zehr, 318 Or. at 653-54).

Turner's medical malpractice and negligence claims collectively contain the following allegations:  Nurse Wahls failed to diagnose and treat his spinal stenosis, failed to obtain a qualified medical evaluation of Turner, failed to refer him to a neurologist or other skilled physician, delayed treatment of his spinal stenosis, and failed to provide medical care and treatment associated with the minimal standards of a competent medical professional.

With respect to the standard of care, Nurse Wahls was required "to exercise that degree of care, knowledge and skill ordinarily possessed and exercised by the average provider of that type of medical service."  Curtis v. MRI Imaging Servs. II, 327 Or. 9, 14, 956 P.2d 960 (1998).  As for causation, "[c]ertainty of causation is not required; however, the plaintiff must prove that the 'defendant's conduct was the likely cause' of the plaintiff's injuries."  Smith v. Providence Health & Servs.-Oregon, 270 Or. App. 325, 330, 347 P.3d 820 (Or. App. 2015) (quoting Marcum v. Adventist Health Sys./West, 345 Or. 237, 248 n.10, 193 P.3d 1 (2008)).  "In other words, '[a] medical malpractice claim requires proof that the negligent medical care caused an injury that nonnegligent care would have avoided.'"  Id. at 332 (quoting Son v. Ashland Comty. Healthcare Servs., 239 Or. App. 495, 508, 244 P.3d 835 (2010)).

Turner's expert offers very little in the way of opinion or evidence on whether Nurse Wahls violated the standard of care, and whether any action or inaction on her part caused harm to Turner.[9]  See Jeffries v. Murdock, 74 Or. App. 38, 43, 701 P.2d 451 (1985) ("in the great

_____

[9]This has been a problem for Dr. Ochoa in the past.  See Allphin v. Peter K. Fitness, LLC, __ F. Supp.3d ___, 2015 WL 375621, at *6 (N.D. Cal. Jan. 28, 2015) (Dr. Ochoa failed to identify "what other types of neurological exams Plaintiff should have received above and beyond those she was given by her treating doctors, nor does he explain any defects in the exams performed.").

Page 22 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

majority of [medical malpractice] cases expert testimony is required"). Instead, Dr. Ochoa

asserts the following:

- "Although Mr. Turner was under formal <u>nursing</u> care as an ailing inmate, his care was substandard. Individual nurses would often do a less than optimal job. But, the reality is that Mr. Turner required <u>medical</u> care for diagnosis and treatment." Estok Decl. in Supp. of Wahls' Mot. for Summ. J. Ex. 3, at 2.

- "Did the frivolous hypotheses advanced by an unsigned nurse proposing that the seemingly neurological display of Mr. Turner amounted to simulation of illness (<u>malingering</u>) distract and mislead diagnosis and management? Yes. It definitely did mislead." <u>Id.</u>

- "I have no reason to assume that the nursing staff <u>did not</u> do the best they could . . . in their job description as nurses. However, they should have been aware of the limits of their professional qualifications and thus realize that they should have deferred to physicians when it came to medical diagnostic and therapeutic issues. The most flagrant example was the unqualified diagnosis of <u>malingering</u> by one (unsigned) nurse. This aberration seemingly caught in the minds of other nursing staff, thus planting an unspoken bias in the nursing care of Mr. Turner. This prisoner had at least several legitimate reasons to protest, which he did, without being 'non compliant.' So, the nursing standards were substandard." <u>Id.</u> at 3.

Although Dr. Ochoa does not name Nurse Wahls, I glean from the context he is referring

to her. However, he does not offer an opinion about what the nursing standard of care is in the

correctional environment, explain how Nurse Wahls breached that standard of care, and, most

importantly, does not offer an opinion to a reasonable degree of medical probability that Nurse

Wahls caused any injury to Turner. On this last item, "[w]ithout causation alleged in terms of a

reasonable probability, a professional negligence claim fails." <u>Smith</u>, 270 Or. at 332.

The primary concern Dr. Ochoa raises with respect to Nurse Wahls' care of Turner was

her assessment of malingering and the implication that she somehow tainted the chain of care.

However, there is no evidence Nurse Wahls' assessment of malingering affected Turner's care at

Multnomah County in any material way; Dr. Rose requested and received permission to refer

Turner to a neurologist the day after Turner arrived at Inverness.  Additionally, as Nurse Wahls'

expert has noted, "[h]er conclusions about the patient were not unreasonable, especially when

one considers the subsequent evaluation by Dr. Gibbs, an experienced neurologist, two months

later, who essentially arrived at the same conclusions, but thought it was necessary to 'rule out'

myelopathy."  Wilson Decl. Ex. A, at 5.  As to Turner's anticipated response that Nurse Wahls

gave Dr. Gibbs the notion of malingering, Dr. Gibbs confirmed in his deposition that he used his

own independent, professional judgment to evaluate Turner, that his purpose "was to do a

neurologic assessment to see if there was a neurologic problem" and his findings "shouldn't be"

affected or influenced by another provider.  Estok Decl. Ex. 2, at 11.  Similarly, Dr. Shelton, the

other expert hired by Nurse Wahls, observed, "When objective findings were noted they were

acted upon in a medically appropriate manner based on their professional medical judgments,

including MRI's.  The word 'malingering' in NP Wahls['] note of 9/16/2010 as applied to Mr.

Turner did not block or hinder his care, evaluation, or outcome."  Shelton Decl. Ex. A, at 6.

        As for Nurse Wahls' failure to identify and treat Turner's spinal stenosis, or send him to a

medical professional who could treat him, Turner has failed to raise a material issue of fact that

"'the absence of medical or surgical treatment at [the time of Nurse Wahls' examination] resulted

in damage which would not have occurred if the treatment had been administered.'"  Smith, 270

Or. App. at 331-32 (quoting Horn v. Nat'l Hosp. Assoc., 169 Or. 654, 670, 131 P.2d 455 (1942)).

As an initial matter, there is no evidence immediate medical and surgical treatment was indicated

at the time of Nurse Wahls' September 8 or 16 examinations of Turner.[10]  Turner's own expert

states only that the neurosurgeon's recommendation of cervical laminectomy and cervical

thoracic fusion, a recommendation made December 23, was "a quasi emergency imperative, as

Mr. Turner was worsening steadily in front of his health providers' eyes, while jailed."  Estok

Decl. in Supp. of Wahls' Mot. for Summ. J. Ex. 3, at 2.  Dr. Ochoa does not say unequivocally

that Turner's condition required emergency surgery, nor does he state when such surgery should

have occurred.  Neither Dr. Gibbs nor Dr. Nemecek recommended immediate surgery and neither

scheduled Turner for immediate MRIs and CT scans.[11]  Indeed, even after the MRI on December

2 disclosed severe spinal stenosis and the need for a neurosurgery consultation was identified,

OHSU did not schedule Turner for a neurosurgical appointment until December 23.

    The two defense experts, Dr. Wilson and Dr. Shelton, opined that Nurse Wahls provided

appropriate care.  According to Dr. Wilson, Turner's "myelopathy was not an emergent condition

at the time he saw Ms. Wahls.  His neurological status appears to remain stable for several

months after she saw him."  Wilson Decl. Ex. A, at 5.  Dr. Shelton similarly opined, "The

symptoms he voiced [at the September 16 appointment] were inconsistent and did not indicate an

emergent process; the objective exam indicated no emergent process and no need for an

emergency room trip, nor an emergency CT, nor an emergency MRI."  Shelton Decl. Ex. A, at 5.

Finally, Turner was transferred seven days later and seen by a physician, who referred Turner to a

---

[10]The evidence is clear that the earliest Turner complained in earnest about new back pain-related symptoms was September 8.  Pl.'s Ex. B, at 6(a).

[11]Turner asserts in his response that Dr. Nemecek explained he needed immediate surgery, but there is no evidence corroborating Turner's assertion.  Pl.'s Resp. 7.

neurologist.[12]

In sum, Turner fails to raise a material issue of fact sufficient to survive Nurse Wahls'

motion for summary judgment.  I dismiss with prejudice Turner's First and Third claims against

Nurse Wahls.

2.    Civil Rights Violation

Turner separately alleges Nurse Wahls was deliberately indifferent to his medical needs

by denying him medical care or by providing inadequate medical care.

The treatment a pre-trial detainee receives in prison and the conditions of his confinement

are subject to scrutiny under the Fourteenth Amendment, but the standard for evaluating the

claim is the same as under the Eighth Amendment.  Clouthier v. Cnty. of Contra Costa, 591 F.3d

1232, 1241 (9th Cir. 2010); Bell v. Wolfish, 441 U.S. 520, 537 n.16 (1979).  Thus, a claim that a

"correction facility official[] violated pretrial detainees' constitutional rights by failing to address

their medical needs [is evaluated] under a 'deliberate indifference' standard."  Clouthier, 591

F.3d at 1241.  "[A] prison official cannot be found liable under the Eighth Amendment for

denying an inmate humane conditions of confinement unless the official knows of and disregards

an excessive risk to inmate health or safety . . . ."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

A difference of opinion as to the specific course of treatment does not establish deliberate

indifference.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

As there is no material issue of fact indicating Nurse Wahls provided negligent treatment,

Turner cannot meet the much higher standard demonstrating she was deliberately indifferent to

_____

[12]It was fortuitous for Nurse Wahls that Turner and his counsel advocated so strenuously
for his transfer to Inverness, where a neurologist referral was made.

his medical needs.  Farmer, 511 U.S. at 837 (knew prisoner faced a substantial risk of serious

harm and disregarded that risk by failing to take reasonable steps to abate it); Toguchi v. Chung,

391 F.3d 1051, 1058 (9th Cir. 2004) (actions giving rise to medical malpractice are insufficient to

make out a violation of Eighth Amendment); McGuckin v. Smith, 974 F.2d 1059 (9th Cir. 1992)

(mere negligence in diagnosing or treating a medical condition, without more, does not violate a

prisoner's Eighth Amendment rights), overruled on other grounds by WMX Tech., Inc. v. Miller,

104 F.3d 1133 (9th Cir. 1997).

Instead, the evidence shows Nurse Wahls learned about the exacerbation of Turner's

back-related symptoms no earlier than September 8, when Turner was already being treated for

his back pain with Neurontin, Mobic and ibuprofen.  Nurse Wahls gave Turner a complete

examination on September 16 to assess whether Turner's demand for an emergency room visit

was necessary.  She concluded he was malingering and prescribed acetaminophen.  There is no

evidence Nurse Wahls knew Turner faced a "substantial risk of serious harm and disregard[ed]

that risk by failing to take reasonable steps to abate it."  Farmer, 511 U.S. at 837; Sanchez, 891

F.2d at 242 (difference of opinion about treatment does not amount to deliberate indifference to

serious medical needs).  As I indicated above, none of the experts, including Turner's own

expert, opined emergency back surgery or other treatment was required based on the symptoms

Turner reported on September 8.

I dismiss with prejudice Turner's Fourth claim against Nurse Wahls.

B.    Dr. Ersson

1.    Medical Malpractice

In Turner's medical malpractice and negligence claims against Dr. Ersson, Turner alleges

Dr. Ersson was negligent in failing to diagnose and treat his spinal stenosis, failing to obtain a

qualified medical evaluation, failing to refer him to a neurologist or neurosurgeon, failing to

provide him with medical care and treatment for his problems, and delaying treatment of his

spinal stenosis.

Just as with his claims above, Turner must plead and prove the following elements in his

medical malpractice claim against Dr. Ersson:  (1) a duty ran from the doctor to Turner; (2) Dr.

Ersson breached that duty; (3) Turner was harmed in a way that is measurable in damages; and

(4) a causal link exists between the breach and the harm.  Moser, 223 Or. App. at 55-56.

Dr. Ochoa's opinions on Dr. Ersson's care are as follows:

- "Serious urological and bronchial pulmonary complications occurred which forbid
the neurosurgical initiative to the patient's major detriment.  Once [a]gain, the
provided health care was substandal.  He was known to have chronic COPD and
was recorded as being hypoxic and to develop parenchymal lung infection,
recurrently.  He had likely phlebitis of the lower extremities with chronic edema,
tenderness and local inflammatory signs ("cellulitis"), but prophylaxis for
thromboembolism was not considered until bilateral pulmonary emboli had
happened, complicated with bilateral pneumonia requiring ICU critical care,
intubation, IV antibiotics, anticoagulants and sedatives."  Estok Decl. in Supp. of
Wahls' Mot. for Summ. J. Ex. 3, at 2.

- "Mr. Turner harbored serious organic pathology of spinal cord and other systems,
and went on to develop life threatening acute reactivation and new complications
of vascular and lung pathology (and kidney?)."  Id. at 3.

- "The individuals in this hierarchical strata of the health care pyramid should have
briskly consulted/delegated to the best informed possible specialists.  This just did
not happen when it should.  The nonchalant timeline was substantially aggravated
by built-in institutional bureaucratic standards."  Id.

- "The performance of the physicians who cared for Mr. Turner in jail was also
substandard.  They replicated, at a higher professional hierarchy, the same basic
flaw that applies to nursing.  They did not consult truly qualified professionals in a
timely manner when the patient evolved clinically away from their own
qualifications and expertise."  Id.

Even viewing the facts in the light most favorable to Turner,[13] Dr. Ochoa's expert report is insufficient as matter of law to support a negligence claim against Dr. Ersson. Dr. Ochoa does not provide an opinion regarding the relevant standard of care for a family medicine physician in a corrections setting, nor does he say Dr. Ersson's care fell below the standard of care. Even setting aside the question of whether magic words are necessary in an expert report, Dr. Ochoa does not provide an opinion regarding specific acts of negligence that caused any specific injury to Turner with any reasonable degree of medical probability.

The evidence instead reflects that the first chart note in Turner's medical record upon his return from Inverness was Dr. Ersson's, who simply reviewed Turner's medical records from NORCOR. Turner's first appointment upon returning to Inverness was with Dr. Rose, not Dr. Ersson–and it occurred the very next day. Dr. Rose questioned Turner's symptoms but immediately referred Turner for a neurological consultation. Five days later, Turner had signed the consent form to support the referral, and the very next day the U.S. Marshals Service approved the appointment. Despite repeated contacts with OHSU, initiated by Inverness medical personnel, OHSU did not schedule Turner's appointment with a neurologist until November 16. See Ersson Decl. and Pl.'s Ex. A (nurse called 10/4/2010; twice on 10/11/2010; on 10/14/2010; on 10/15/2010; and on 10/18/2010). Turner offers no evidence Dr. Ersson had control over appointments at OHSU or was responsible for any delay in obtaining approval from the U.S. Marshals Service.

---

[13]For this reason, I give no credence to the opinions of Dr. Ersson and Dr. Wilson that Turner was a difficult patient who was drug-seeking. Turner asserts he was advocating for appropriate medical care, and that he specifically did not request strong pain medications–until after the MRI demonstrated an anomaly–so as to dispel questions about his motivations.

Turner challenges Dr. Ersson's characterization of the record, pointing out that it was Dr. Rose who made the initial neurology referral request. He asserts Dr. Ersson "never gave plaintiff a referral to see any type of specialist or allow him to be sent to a hospital emergency room[.]" Pl.'s Resp. 17. The evidence clearly contradicts Turner's assertion. Once Dr. Gibbs indicated an MRI was called for, Dr. Ersson requested the MRI, and Dr. Ersson immediately requested the neurosurgery consultation once he obtained the MRI results. As for the initial consultation request on September 24, it is impossible to know whether Dr. Ersson would have sought the consultation had Dr. Rose not; but there was no need for Dr. Ersson to do so since Dr. Rose had done so.

Additionally, Turner asserts Dr. Ersson characterized him as a malingerer, but it was actually Dr. Rose who did so. Ersson Decl. Ex. 2, at 1. Turner also indicates Dr. Ersson sent a note to Dr. Gibbs stating he believed Turner was malingering, but Turner provides no evidence to support his assertion. Pl.'s Resp. 18. To the extent "information" was faxed to OHSU on September 29, the chart note that would have been sent was Dr. Rose's since Dr. Ersson had yet to examine Turner; Dr. Ersson's only chart note at that time was simply a reiteration of NORCOR's last chart note. Ersson Decl. Ex. 4, at 1. Finally, Dr. Gibbs testified that he used his own independent judgment in evaluating Turner's neurological status.

Turner repeatedly argues Dr. Ersson should have sent him to the emergency room instead of waiting for Dr. Gibbs to examine him.[14] As with the same allegation against Nurse Wahls,

---

[14]Dr. Ersson objects that Turner raises the issue of emergency care for the first time in Turner's Second Response to defendants' Motion for Summary Judgment. However, Turner made the same argument multiple times in his initial Response to defendants' motion (pages 17, 19, and 20) and the allegations in his complaint are sufficiently broad to include an assertion that emergency medical care was required for diagnosis and treatment of his medical problems.

Turner provides no evidence immediate medical and surgical treatment was indicated at the time of Dr. Ersson's care of Turner prior to Dr. Gibbs' examination.  Turner's own expert states only that the neurosurgeon's recommendation of cervical laminectomy and cervical thoracic fusion was "a quasi emergency imperative, as Mr. Turner was worsening steadily in front of his health providers' eyes, while jailed."  Estok Decl. Ex. 3, at 2.  Dr. Ochoa does not state when such surgery should have occurred and, in any event, opining that a need is "quasi emergency" is not an opinion that immediate emergency care should have occurred.  Neither Dr. Gibbs nor Dr. Nemecek recommended immediate surgery and neither scheduled Turner for immediate MRIs and CT scans.[15]  Indeed, even after the MRI on December 2 disclosed severe spinal stenosis and a need for a neurosurgery consultation was identified, OHSU did not schedule Turner for an appointment until December 23.  Dr. Ersson even paged Dr. Gibbs on December 13 to discuss the case, but Dr. Gibbs did not respond to his page.  Dr. Ersson cannot be liable for OHSU's delay; after all, Dr. Gibbs did not request an urgent MRI, and then did not request an urgent neurosurgical consultation, and he was the specialist involved in Turner's care.  In short, Turner can point to no genuine dispute of material fact showing with a reasonable degree of medical probability that Dr. Ersson caused him harm.  Indeed, "[p]roof of cause-in-fact must have the quality of reasonable probability and a mere possibility that the alleged negligence of the defendant was the . . . cause of plaintiff's injuries is not sufficient."  Joshi v. Prov. Health Sys. of Or. Corp., 198 Or. App. 535, 545, 108 P.3d 1195 (2005).

    With regard to the medical care Turner received at Inverness between December 23–the

---

[15]Turner asserts in his response that Dr. Nemecek explained he needed immediate surgery, but there is no evidence corroborating Turner's assertion.  Pl.'s Resp. 7.

date of his neurosurgical consultation with Dr. Nemecek–and January 8–when Turner was admitted to the hospital for acute respiratory failure secondary to multilobar pneumonia and bilateral pulmonary emboli–Dr. Ochoa does not offer any opinion about whether or how Dr. Ersson's treatment of Turner caused him harm.  Instead, the evidence reflects Turner was admitted to the hospital on two occasions–December 25 and December 29–and received medical care at Inverness in the interim.  It is true, as Turner points out, that Dr. Ersson did not personally send Turner to the emergency room on these three occasions, but Turner provides no medical opinion that Dr. Ersson should have treated Turner differently either to avoid or limit the harm from the condition requiring Turner's hospitalization a third time on January 8.  In short, Turner has failed to raise a material issue of fact that "'the absence of medical or surgical treatment at [the time of Dr. Ersson's care] resulted in damage which would not have occurred if the treatment had been administered.'"  Smith, 270 Or. App. at 331-32.

I dismiss with prejudice Turner's First and Second claims against Dr. Ersson.

2.    Civil Rights Violation

Just as with the identical claim against Nurse Wahls, since there is no material issue of fact supporting Turner's negligence claim against Dr. Ersson, Turner cannot meet the much higher burden demonstrating Dr. Ersson was deliberately indifferent to Turner's medical needs. Farmer, 511 U.S. at 837 (knew prisoner faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to abate it); Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (actions giving rise to medical malpractice are insufficient to make out a violation

of Eighth Amendment).[16]

To raise a triable issue of fact, Turner is required to point to facts suggesting Dr. Ersson "purposefully ignore[d] or fail[ed] to respond to a prisoner's pain or possible medical need[,]" McGuckin, 974 F.2d at 1060, or "that the course of treatment [Dr. Ersson] chose was medically unacceptable under the circumstances and in conscious disregard of an excessive risk to [Turner's] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). Instead, the evidence shows Dr. Ersson noted Turner's neurological complaints, another staff physician requested a neurologist consultation the day after Turner arrived at Inverness, various Inverness staff called OHSU six times between October 4 and October 18 to schedule the appointment, a neurologist (Dr. Gibbs) examined Turner on November 16 (the first available appointment at OHSU), the outside neurologist (Dr. Gibbs) was not convinced Turner had a physical problem, Dr. Ersson followed through on the neurologist's recommended MRI, the MRI was not scheduled until December 2, Dr. Ersson requested a neurosurgery consultation the very next day after he received the MRI results, Dr. Ersson paged Dr. Gibbs on December 13 but got no response, OHSU scheduled the neurosurgery consultation on December 23, and the neurosurgeon (Dr. Nemecek) did not request an immediate MRI or CT scan and did not recommend immediate surgery.

In the meantime, the institution provided Turner with a wheelchair, essentially the same medications he had received while at NORCOR, and reassessed medications when Turner requested a change. There is no evidence Dr. Ersson knew Turner faced a "substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable steps to abate it." Farmer,

---

[16]For this reason, there is no need for me to address Dr. Ersson's alternative qualified immunity argument.

511 U.S. at 837.  Based on this history, Turner's argument that Dr. Ersson either failed to treat

his back condition, or was responsible for the delay in getting his back condition treated, is

simply not supported by the record.  See McGuckin, 974 F.2d at 1062 (since no evidence prison

doctors were responsible for scheduling CT scan or hindered the scheduling, or were responsible

for scheduling surgery or for ensuring surgery occurred promptly, they were not deliberately

indifferent); cf. Jett v. Penner, 439 F.3d 1091 (9th Cir. 2006) (prison doctor failed to schedule an

appointment with a specialist for well over a year, despite several recommendations from other

doctors that further examination was necessary).

I dismiss with prejudice Turner's Fourth claim against Dr. Ersson.

C.    Multnomah County

Turner's negligence allegations against Multnomah County are not well-defined in his

pleading and simply replicate those he makes against Dr. Ersson and Nurse Wahls.  In short, he

alleges Multnomah County was negligent in failing to diagnose his spinal stenosis, obtain a

qualified medical evaluation, and provide him medical care.  In his response to the County's

motion for summary judgment, Turner expands on his theory of liability:  that Multnomah

County has a policy of waiting and seeing, thereby delaying necessary medical care.  However,

Turner relies on law relating to Eighth Amendment constitutional violations; Turner has not

alleged Multnomah County violated any of his constitutional rights.

The only statement Dr. Ochoa makes about Multnomah County's alleged negligence is as

follows:  "This vital component of the *gestalt* is very substandard.  In short, the administrative

health system routines have been unhealthily bureaucratic."  Estok Decl. Ex. 3, at 3.

As with Turner's negligence claim against Dr. Ersson, Dr. Ochoa does not provide any

Page 34 - OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

opinion about the County's standard of care, how it breached that standard of care, or how Turner was injured by any specific act of negligence. "When the element of causation involves a complex medical question, as a matter of law, no rational juror can find that a plaintiff has established causation unless the plaintiff has presented expert testimony that there is a reasonable medical probability that the alleged negligence caused the plaintiff's injuries." Baughman v. Pina, 200 Or. App. 15, 18, 113 P.3d 459 (2005).

I dismiss with prejudice Turner's First claim against Multnomah County.

## CONCLUSION

For the foregoing reasons, defendants' Motions to Strike [118, 121] are denied and their Motions for Summary Judgment [131, 135] are granted. This action is dismissed with prejudice.

IT IS SO ORDERED.

DATED this ____3rd_____ day of June, 2015.


  _/s/ Garr M. King_____
Garr M. King
United States District Judge